UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AT&T INC., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| v. | § | |
| | § | SA-07-CV-0197 OG |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**

TO:  Honorable Orlando Garcia
 United States District Judge

This report and recommendation addresses the United States Government's motion for summary judgment.[1] I have authority to issue this report and recommendation pursuant to the district court's order of referral.[2]

The plaintiff succinctly stated the issue presented in this case in its response to defendant's motion for summary judgment:

> This case involves the tax treatment of payments AT&T received in 1998 and 1999 from "universal service" programs created or reformed by federal and state governments during a period of wholesale market changes in the mid-1990s, when local telephone markets were opened to competition and old forms of monopoly regulation were abolished. *The ultimate issue in this case is whether the payments to AT&T should be included in gross income, or instead, treated as non-shareholder contributions to the capital of AT&T.*[3]

---

[1]Docket entry # 43.

[2]Docket entry # 44.

[3]Docket entry # 51, p. 1 (italics added).

The Tax Code excludes contributions to capital from gross income.[4] If, as AT&T contends, universal service payments are excluded from gross income, taxes on the payments are deferred. If, as the Government contends, the universal service payments are revenues instead of contributions to capital, the payments are included in AT&T's gross income and subject to taxation. The Tax Code does not address whether universal service payments constitute contributions to capital. The matter before the Court is whether there are disputed fact issues which are material to the determination of whether the payments were capital contributions or revenue payments.

There are two types of universal service payments at issue in this case—high-cost program payments and low-income program payments. AT&T received these payments from the federal government and from the state governments in Texas, Kansas, and California. AT&T excluded both types of universal service payments in its tax returns for tax years ending on December 31, 1998 and December 31, 1999. The Internal Revenue Service (IRS) determined that AT&T had erroneously excluded the payments and assessed additional tax.[5] AT&T paid the additional tax and then sought a refund of taxes paid on universal service payments. The IRS denied AT&T's claims for refunds. By this lawsuit, AT&T seeks refunds of federal income taxes in the amount of $244,140,055 for the 1998 tax year and $261,105,462 for the 1999 tax

---

[4]*See* 26 U.S.C. § 118 ("In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."). The Tax Code defines gross income as follows: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived . . . ." 26 U.S.C. § 61(a).

[5]Docket entry # 52, exh. 39.

2

year.[6]

The Government's argument for summary judgment is straight-forward. The Government maintains that whether high-cost program universal service payments constitute non-shareholder contributions to capital is a legal question that has already been decided by the United States Court of Appeals for the Eleventh Circuit. In *United States v. Coastal Utilities*, the United States District Court for the Southern District of Georgia considered "whether the universal service support payments [received by defendant Coastal Utilities] are includable in gross income or whether they constitute a nonshareholder contribution to capital, which is excludable from income under § 118 of the Internal Revenue Code."[7] In an extraordinarily detailed opinion the district court determined that "[b]ecause the universal support payments are based on investment return and expenses, the payments are supplemental income and not a contribution to capital."[8] The district court reasoned that "the calculations used to determine the amount of payments show that the funds were designed to supplement the revenue lost as a result of the mandated rate reduction on intrastate calls."[9] Finding the district court's order "thorough and well-reasoned," the Eleventh Circuit agreed with "the district court's analysis of the facts and applicable law and [adopted] in full the district court's order. . . ."[10] In so doing the appellate

---

[6] Docket entry # 1, pp. 1-2.

[7] *United States v. Coastal Utilities*, 483 F. Supp. 2d 1232, 1234 (S.D. Ga. 2007), *aff'd*, 514 F.3d 1184 (11th Cir. 2008).

[8] *Id.* at 1242.

[9] *Id.* at 1251.

[10] *United States v. Coastal Utilities*, 514 F.3d 1184, 1184 (11th Cir. 2008).

3

court affirmed the district court's granting of summary judgment for the government.

The issue before the Court in *Coastal Utilities* involved only universal service payments for high-cost service. The case before this Court involves universal service payments for high-cost service <u>and</u> universal service payments for low-income subscriber support.[11] The Government maintains that "the case for characterizing the low income subsidies as taxable income is . . . even more compelling than the one for taxing the high cost service subsidies already decided by *Coastal Utilities*."[12] The Government supported its argument with 45 pages of purportedly undisputed facts and 4½ inches of summary judgment evidence.

In response, AT&T maintained this case is a "factually and legally complex case involving issues of federal tax law [that] should be decided on the basis of a record fully developed at trial." AT&T challenged the Government's argument with a 29-page responsive brief, 84 pages of its version of the facts, characterizing the Government's undisputed facts as immaterial, disputed, or unsupported by the record, and a banker's box of summary-judgment evidence.

The parties agree that the test for determining whether a payment is a contribution to capital is the transferor's intent[13]—in this case, whether in making universal service payments federal and state governments intended to subsidize telecommunications providers for revenues lost in providing service in high-cost areas and to low-income subscribers, or whether federal and

---

[11]There is one other difference: the state universal service program considered by the *Coastal Utilities* court was from the state of Georgia.

[12]Docket entry # 43, p. 1.

[13]*See* docket entry # 43, p. 6 & # 51, p. 2.

4

state governments intended to enlarge the capital structures of eligible telecommunications providers. Relying on the Fifth Circuit's opinion in *G.M. Trading v. Commissioner*,[14] AT&T maintains that the district court must apply the five factors[15] identified by the Supreme Court in *United States v. Chicago, Burlington & Quincy Railroad Company*[16] (CB&Q) to determine intent. The *Coastal Utilities* court considered those factors, the holding in CB&Q, and earlier cases which provide direction in assessing motivation and intent for payments, and concluded that "a detailed holding of each of the CB&Q factors would not be helpful in resolving the ultimate issue."[17] The court explained that the "Supreme Court acknowledged that the five factors are merely 'some of the characteristics' of a nonshareholder contribution to capital, and, . . . there are other characteristics that provide clearer guidance as to the contributor's motivation in making the universal support payments."[18] The *Coastal Utilities* court found that "the

---

[14]121 F.3d 977 (5th Cir. 1997). In *G.M. Trading*, the United States Court of Appeals for the Fifth Circuit considered only the second factor because the IRS contested only the second factor. *G.M. Trading*, 121 F.3d at 981. The Fifth Circuit considered the second factor in determining the intent of the Mexican government in granting Mexican pesos to a Texas corporation. The Fifth Circuit determined that a portion of the grant was to induce the Texas corporation to invest in the Mexican economy, and thus a nontaxable contribution to capital. *Id*.

[15]*See United States v. Chicago, Burlington & Quincy R.R. Co*., 412 U.S. 401, 413 (1973) ("[S]ome of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes [include:] It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.").

[16]412 U.S. 401, 413 (1973).

[17]*Coastal Utilities*, 483 F. Supp. 2d at 1250.

[18]*Id*.

mechanisms by which the universal support payments were calculated and distributed indicates that the motivation was to supplement revenue."[19]

No authority from the Fifth Circuit or any other circuit requires strict application of the five CB&Q factors to determine the intent of the transferor/governmental entity when making either of the payments at issue here. As *Coastal Utilities's* reasoned, the calculations for both high-cost service payments and low-income subscriber payments indicate the governmental entities intended to supplement lost revenues. Previously, the Fifth Circuit considered the formulas used to calculate payment amounts and characterized universal service payments for high-cost programs as subsidies available when a carrier's operating expenses exceed national averages.[20] This characterization supports the government's position that universal service payments constitute revenue rather than contributions to capital.

AT&T relies heavily on the general argument that capital improvements are needed to provide telecommunications services. No question exists that "telephone networks are capital

---

[19]*Id*.

[20]*See Alenco Communications v. F.C.C.*, 201 F.3d 608, 617 (5th Cir. 2000) ("To meet its historic mandate of universal service, the FCC has established a universal service fund to *subsidize* high-cost rural LEC's [local exchange carriers] to reduce the rates they must charge their customers. An LEC is eligible for a subsidy if its operating expenses—its "loop costs"—are fifteen percent or more above the national average.") (italics added); *Tex. Office of Public Util. Counsel v. F.C.C.*, 183 F.3d 393, 406 (5th Cir. 1999) ("Rather than relying on market forces alone, the agency has used a combination of implicit and *explicit subsidies* to achieve its goal of greater telephone subscribership. Explicit subsidies provide carriers or individuals with specific grants that can be used to pay for or reduce the charges for telephone service. This form of subsidy includes using revenues from line charges on end-users to *subsidize* high-cost service directly and to support the Lifeline Assistance program for low-income subscribers.") (italics added).

driven and capital intensive."[21] But the cost of capital improvements is not part of the calculation of the universal service payments. The summary-judgment evidence shows that payments for high-cost area service is "based upon the number of lines in high cost areas multiplied by the amount the cost of the service for these lines exceeds certain national cost benchmarks."[22] "If the total amount due to the carrier is less than the amount of the universal service charges collected, the carrier sends the remaining amount to governmental administrator[s]; if the total is smaller than the amount collected, the administrator sends a payment for the balance to the carrier."[23] Although the cost of capital improvements undoubtedly affects the amount a carrier claims, the computation of payments focuses on revenue (the amount of universal service charges), not capital improvements. If governments intended to reimburse carriers for capital improvements, or "to enlarge the capital structures of qualified providers and encourage their continued

---

[21]Docket entry # 51, p. 5.

[22]Docket entry # 43, p. 5. *See, e.g.*, docket entry # 43, exh. 1, p. 64 (testifying that universal service funding is based on telecommunications service providers' interstate revenue and explaining that claims for payments are based on interstate revenue); *id.*, exh. 3, pp. 40 & 52 (explaining that the Texas Public Utility Commission makes payments when the cost of providing service exceeds a carrier's revenue for a particular wire center and that federal income tax was considered in developing the formula for determining the costs for wire centers); *id.*, exh. 8, p. 52 (stating that companies base claims for high-cost area support in California on their lines and the cost of providing service with those lines); *id.*, exh. 12, pp. 24, 28-32 (explaining how the Kansas universal service fund for high-cost service replaces lost revenue); *id.*, exh. 14, pp. 36-38 & 60-66 (testifying that federal universal service fund assessments are based on a subset of AT&T revenues and that the assessments are treated as revenue); *id.*, exh. 16, pp. 56 & 80 (stating that AT&T cannot trace universal service money to specific capital improvements); docket entry # 53, Peter Hayes deposition, pp. 113-18 (describing how the California high-cost program fund offsets the cost of providing service in high-cost areas). *See also Bluestem Tel. Co. v. Kansas Corp. Comm'n*, 109 P.3d 194, 197 (Kan. Ct. App. 2005) (stating that the Kansas universal service fund was "at first designed to be an explicit subsidy to *replace some of these lost revenues* and ameliorate the impact of rate increases on local consumers") (italics added).

[23]Docket entry # 43, p. 5.

investment in networks necessary to achieve universal service in the new competitive environment,"[24] or "to induce facilities-based carriers to invest in the telecommunications network,"[25] governments would logically base universal service payments on expenditures for capital investments. This type of payment structure would require telecommunications carriers to show that universal service payments are used for capital improvements to provide universal service. But governments do not require carriers to show that universal service funds are used on capital improvements.[26] Instead, claims and payments are based on the cost of providing service and revenue lost providing service. Basing claims on the cost of service and revenue reflects an intent to subsidize carriers for lost revenue, because carriers are not paid unless the cost of providing service exceeds the amount of collected universal service charges.

The argument for characterizing low-income subscribers payments as revenue—not at issue in *Coastal Utilities*—is compelling because universal service payments for low-income programs are based on "the number of low income customers receiving discounted service multiplied by the amount of the discount per customer;"[27] the payments reimburse carriers for the revenue lost in providing discounted service. Under low-cost programs, carriers provide service

---

[24]Docket entry # 51, p. 8.

[25]Docket entry # 43, exh. 19, p. 2.

[26]*See, e.g.,* docket entry # 52, David Hostetter deposition, p. 21 (testifying that AT&T isn't required to track expenditures of universal service funds); *id.*, Ann Hughes deposition, p. 73 (stating that Southwestern Bell wasn't required to earmark or segregate funds from the Kansas universal service fund for capital expenditures; *id.*, Jack Leutza deposition, p. 52 (responding that carriers were not required to provide the California Public Utilities Commission with budget plans for expanding high-cost services).

[27]Docket entry # 43, p. 5.

at discounted rates[28] and governments reimburse carriers for revenues lost in providing discounted services.[29] The claim forms for universal service payments require carriers to report the number of low-income customers served.[30] Regulations for universal service payments require carriers to keep records of the revenue it foregoes to provide discounted service.[31]

---

[28]*See, e.g.*, docket entry # 43, exh. 5, p. 252 (requiring carriers to provide Tel-Assistance Service to eligible consumers in the form of a 65% reduction in the applicable tariff rate for qualifying service); *id*., exh. 8, pp. 67-69 (explaining that the California Lifeline program provided for a 50% discount for low-income customers); *id*., exh. 11, § 7.1.4 (requiring utilities to charge the lower of 50% of the utility's regular tariffed rate or one-half of Pacific Bell's regular tariffed rate for monthly local service); docket entry # 52, Jack Leutza deposition, p. 69 (explaining that California Lifeline program compensates carriers for uncollected revenues).

[29]*See, e.g.,* 47 C.F.R. § 54.413 (providing that "[e]ligible telecommunications carriers may receive universal service support reimbursement for the revenue they forgo in reducing their customary charge for commencing telecommunications service); docket entry # 43, exh. 11, § 8.3 (outlining the lost revenues carriers can recover from providing universal service to low-income customers in California); *id*., exh. 12, p. 43-44 (testifying that the Kansas universal service fund reimburses carriers for monies no longer received from the customer by multiplying the number of lines qualifying for the Lifeline program times the Lifeline rate); docket entry # 51, Peter Hayes deposition, pp. 79-81 (explaining how Pac-Bell was reimbursed by state and federal governments for providing discounted service to low-income subscribers).

[30]*See* FCC Form 497, Lifeline and Link Up Worksheet ( requiring carriers who claim federal universal service payments for providing discounted services to report number of low-income subscribers receiving federal Lifeline support), *available at* www.universalservice.org; docket entry # 43, exh. 7 (requiring carriers in Texas to report number of Lifeline customers); *id*., exh. 11, last page of exhibit (requiring carriers to report the weighted average number of customers in column F for reimbursement of lost revenue in providing Lifeline service in California); *id*., exh. 13 (requiring carriers in Kansas to submit number of lifeline lines).

[31]*See* 47 C.F.R. § 54.407(c) ("In order to receive universal service support reimbursement, the eligible telecommunications carrier must keep accurate records of the revenues it forgoes in providing Lifeline [services]."); 47 C.F.R. § 54.413(a) ("Eligible telecommunications carriers may receive universal service support reimbursement for the revenue they forgo in reducing their customary charge for commencing telecommunications service. . . ."); docket entry # 43, exh. 5, p. 209 (requiring carriers to file monthly reports with Texas universal service fund administrator detailing lost revenues associated with the 65% discount applied to Tel-Assistance Service accounts); *id*., exh. 8, p. 139 (explaining that California compensates carriers for the discounted revenues received from low-income

Nothing in the payment structure for low-income programs implicates capital contributions.

**Recommendation**. AT&T submitted a large volume of summary-judgment evidence—numerous depositions and historical documents—but did not explain why or how this evidence raises a material fact question. Notably, the parties have had almost two years to develop the factual record. Although "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment,"[32] I examined AT&T's summary-judgment evidence to determine if the documentary evidence raises a fact question. I found nothing raising a fact question about whether universal service payments to AT&T constitute non-shareholder contributions to the capital. The summary-judgment evidence indicates the payments were intended to supplement revenues and not as contributions to capital, and therefore includable as gross income under the Tax Code. I recommend GRANTING the Government's motion for summary judgment (docket entry # 43) and ENTERING summary judgment in favor of the Government.

**Instructions for Service and Notice of Right to Object/Appeal**

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified

---

customers).

[32]*Skotak v. Tenneco Resins*, 953 F.2d 909, 916 (5th Cir. 1992).

by the district court.[33] Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the magistrate judge. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.[34] Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[35]

**SIGNED** on May 4, 2009.

_____
NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[33] 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[34] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root*, 200 F.3d 335, 340 (5th Cir. 2000).

[35] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).